IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SCOTT MARSHALL THOMAS DAWYOT, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.  ) | Civil Action No. 7:15-CV-676 |
| ) | |
| NANCY A. BERRYHILL, ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Scott Marshall Thomas Dawyot ("Dawyot") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401-433, 1381-1383f. Specifically, Dawyot alleges that the ALJ failed to properly assess his impairments on a function-by-function basis, erred by finding that he can occasionally stoop, and failed to properly assess his credibility. I find that the ALJ's decision is supported by substantial evidence. Thus, I **RECOMMEND DENYING** Dawyot's Motion for Summary Judgment (Dkt. No. 17), **GRANTING** the Commissioner's Motion for Summary Judgment. (Dkt. No. 21), and **DISMISSING** this action from the docket.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Dawyot failed to demonstrate that he was disabled under the

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, I substitute Nancy A. Berryhill for Carolyn W. Colvin as the defendant in this suit.

1

Act.[2] <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Dawyot filed for SSI and DIB on June 22, 2011, claiming that his disability began on December 5, 2010.[3] Administrative Record, hereinafter "R." 197–198, 208. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 80–104. On May 30, 2014, ALJ Joseph Scruton held a hearing to consider Dawyot's disability claim. R. 28–79. Dawyot was represented by an attorney at the hearing, which included testimony from Dawyot and vocational expert Barry Hensley. <u>Id.</u>

On July 25, 2014, the ALJ entered his decision analyzing Dawyot's claim under the familiar five-step process,[4] and denying Dawyot's claim for benefits. R. 15–27. The ALJ found

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. <u>See</u> 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] Dawyot's date last insured was June 30, 2015. R. 17. Thus, he must show that his disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner

that Dawyot suffered from the severe impairments of chronic obstructive pulmonary disease ("COPD"), status post cerebrovascular accident in October 2010 with residuals, history of several transient ischemic attacks, anxiety disorder and history of substance abuse. R. 17. The ALJ found that these impairments did not meet or medically equal a listed impairment. R. 18–22. The ALJ further found that Dawyot had the residual functional capacity ("RFC") to perform sedentary work with occasional stooping and crouching, seldom kneeling and climbing, and no walking on uneven terrain. R. 23. The ALJ found that Dawyot cannot operate foot controls with his right lower extremity, and cannot perform overhead reaching with his right upper extremity. Id. He can only stand for 15 minute intervals, and can perform the basic mental demands of unskilled work, but may have difficulty with detailed instructions. Id. The ALJ found that Dawyot can maintain attention and concentration for an 8 hour day, 5 days a week to perform unskilled work, and can interact appropriately with supervisors, coworkers and the public, and can respond appropriately to normal work situations and changes in routine. Id.

The ALJ determined that Dawyot could not return to his past relevant work of construction framing carpenter and pool maintenance worker, but that he could work at jobs that exist in significant numbers in the national economy, such as telemarketer and unarmed security guard. R. 27.  Thus, the ALJ concluded that he was not disabled.

Dawyot requested that the Appeals Council review the ALJ's decision.  On October 14, 2015, the Appeals Council denied Dawyot's request for review (R. 1–5), and this appeal followed.

---

at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

## ANALYSIS

### Function-by-Function Analysis

Dawyot asserts that the ALJ erred by 1) failing to address his complaints of fatigue and needing to lay down during the day, and 2) finding that he is capable of occasionally stooping. Pl. Br. Summ. J. p. 31–2. Dawyot argues that the medical evidence reflects that he would require multiple breaks during the workday for fatigue, and is unable to stoop even occasionally due to his right-sided weakness, impaired flexibility and pain. Pl. Br. Summ. J. p. 32.

Dawyot suffered a series of transient ischemic attacks (commonly referred to as ministrokes) and a cerebrovascular accident (a stroke) in October 2010, which were attributed in part to his ongoing cocaine, marijuana and tobacco use. R. 331–454. Dawyot suffered from weakness in his right lower extremity after the stroke. On December 6, 2010, Dawyot was admitted to the hospital for right-side weakness and falling after a night of binge drinking and using cocaine and marijuana. R. 547–665. Upon examination, Dawyot had full strength in both upper extremities and his left lower extremity, and 4/5 strength in his right lower extremity. R. 557. The treating physician noted that Dawyot "endorses subjective worsening of his right sided weakness but I find no object [sic] findings on exam compared to previous exams." R. 561. The hospital recommended inpatient rehabilitation, but Dawyot left against medical advice on December 9, 2010. R. 552. Dawyot returned to inpatient rehabilitation from December 14 through December 23, and upon discharge could perform activities of daily living independently, although the treatment notes state that he had "very poor insight and safety awareness," and is at "high risk for falls and further injury secondary to at-risk behavior." R. 746–47.

On February 15, 2011, Dawyot sought treatment with Allan Katz, Ph.D., and walked without assistance despite not wearing his right ankle-foot orthosis. R. 1118. He reported

4

exercising regularly to increase strength, mobility and sensation in his right lower extremity. Id. Dawyot discussed with Dr. Katz the possibility of returning to driving and employment, as well as his goal of writing a book about his life experiences. Id.

On July 11, 2011, Dawyot visited the emergency room for pain and swelling in his right forearm, and reported falling and twisting his right ankle two days previously while caving. R. 1254. Dawyot also reported forty percent weakness and paresthesia to his right side after his stroke. R. 1256.

On September 28, 2011, Trevar Chapmon, M.D., examined Dawyot and noted that he was "doing well overall, but concerned about his progress." R. 1283. Dr. Chapmon noted that Dawyot's primary problem post-stroke is ataxia[5] in his right lower extremity, mild in his right upper extremity, and paresthesias in his right lower extremity. Dr. Chapmon prescribed neurontin, and noted that Dawyot claims to no longer use cocaine but has had five positive screens for cocaine , and several for marijuana, "so unless he has been through significant treatment it is unlikely he is not using." Dr. Chapmon noted that Dawyot is "doing well with home exercise program," and further stated that he could return to construction work, but "may have some work restrictions." R. 1284.

Dawyot sought emergency room treatment for back pain in January 2012 after falling during a night of drinking. Dawyot's physical examination was normal, aside from superficial lacerations on his hands and back. He was diagnosed with muscle spasms and prescribed Flexeril upon discharge. R. 1323–29. On October 24, 2012, Dawyot saw Dr. Katz and reported feeling "good." R. 1705. He discussed getting a job and going to Fisherville for job training. Id.

---

[5] Ataxia describes a lack of muscle control during voluntary movements, such as walking or picking up objects. See http://www.mayoclinic.org/diseases-conditions/ataxia/basics/definition/con-20030428.

5

On January 26, 2013, Dawyot sought emergency room treatment for right hip pain after falling on concrete. R.1523. His physical examination was normal, aside from some swelling and tenderness in his right hip and lumbar paraspinals. R. 1521. Dawyot complained of decreased sensation in his right leg, but the doctor noted intact sensation. Id. On April 30, 2013, Dawyot reported starting a new job working for a pool company. R. 1690.

Dawyot visited Richard Kauffman, D.O., on January 3, 2014, to establish care for residuals from his stroke. R. 1966. He reported gait instability and frequent falls. Id. Dawyot had a normal examination with full range of motion and full strength, aside from 4/5 strength in right hip flexor and 4/5 quadriceps strength. R. 1967. Dr. Kauffman referred Dawyot to physical therapy for his right-sided weakness. R. 1968.

On March 19, 2014, Dawyot went to Virginia Prosthetics to obtain a replacement ankle-foot orthosis because his was broken in three places. R. 1985. Dawyot walked by vaulting on his left side to clear the toes on the right foot. Id. After hearing the price of the new orthosis, Dawyot left without a replacement. Id.

Dawyot attended physical therapy from January 2014 through May 2014. During physical therapy he performed therapeutic exercises, including walking lunges, and squats to heal raises. R. 2104. He reported walking in his community. R. 2099, 2101, 2105. On May 13, 2014, Dawyot reported to Dr. Kauffman that he was "doing much better with his brace and the Neurontin does help with the pain." R. 2110. He had not been to pain management but physical therapy is helping. Id. He reported falling recently and discontinuing his substance abuse. Id.

### Fatigue

The ALJ considered the medical evidence in detail, as well as Dawyot's testimony about his daily activities, and concluded that he was capable of a very limited range of sedentary work.

6

R. 23–26. Dawyot asserts that the ALJ failed to provide a function-by-function analysis, and specifically failed to address whether he experiences episodes of fatigue necessitating breaks in work, and how often such breaks would occur. Pl. Br. Summ. J. p. 31.  Under Social Security Ruling ("SSR") 96-8p, the ALJ must assess the claimant's work-related abilities on a function-by-function basis, including the functions listed in the regulations. SSR 96-8p, 1996 WL 362207. Only after such a function-by-function analysis may an ALJ express an RFC "in terms of the exertional levels of work." Id.  Dawyot likens this case to the ALJ's decision in Monroe v. Colvin, 826 F.3d 176, 188 (4th Cir. 2016), where the ALJ failed to sufficiently address the claimant's complaints of narcolepsy when developing the RFC.

In Monroe, the claimant testified that he would lose consciousness about two or three times per day and would need to take several breaks during the day because of fatigue. The ALJ found that Monroe's sleep apnea and narcolepsy were severe impairments, and he concluded that Monroe's impairments could reasonably be expected to cause his claimed symptoms.  However, the ALJ failed to make specific findings about whether Monroe's apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur. Rather, the ALJ simply concluded that Monroe was capable of light work and that Monroe's claimed symptoms were "not credible to the extent they are inconsistent with" the RFC the ALJ identified.  Monroe, 826 F.3d at 188.

Here, Dawyot's fatigue is not a severe impairment, but rather a complaint he made during the administrative hearing that the ALJ found unsupported by the record. Dawyot testified at the administrative hearing that he does not sleep well, suffers fatigue and lies down during the day 2 to 3 times for anywhere from 15 minutes to 3 hours. R. 24, 51.  The ALJ considered Dawyot's allegation of fatigue, but found that it was not fully supported by the record. R. 24.

7

The ALJ determined that Dawyot suffered from some residual effects of his stroke, but the medical evidence reflects significant improvement in his condition and physical abilities. R. 25. The ALJ noted that Dawyot had normal mental status exams, and found his complaints and symptoms, including fatigue, to be less than fully credible. R. 24. The ALJ specifically noted that Dawyot walked without an assistive device, reported exercising regularly, and had multiple conversations with his physicians about returning to work. R. 24. Specifically, on February 5, 2011, Dawyot discussed employment possibilities with Dr. Katz, and discussed writing a book about his prior life experience. R. 1118. On September 28, 2011, Dr. Chapmon found that Dawyot could return to work in construction, but may have some restrictions. R. 1284. On October 24, 2012, Dawyot discussed getting a job and going to Fisherville for job training with Dr. Katz. R. 1705. On April 30, 2013, Dr. Hollis noted that Dawyot started a new job working for a pool company. R. 1690. These records do not reflect that Dawyot suffered fatigue to the extent that either he or his physicians believed that it would impact his ability to work.

Substantial evidence supports the ALJ's conclusion that Dawyot's subjective complaints of fatigue were not fully credible and did not require an additional limitation in the RFC. An ALJ's narrative discussion of all of the evidence in support of his findings in determining a claimant's RFC is sufficient to comply with the function-by-function analysis under SSR 96-8p. Here, the ALJ fully discussed Dawyot's medical evidence, Dawyot's allegations regarding his symptoms and limitations, and the medical opinions in the record. R. 17–26. Thus, unlike in Monroe, the ALJ gave a sufficient explanation of why Dawyot's complaints of fatigue did not translate into a limitation in the RFC.

8

**Stooping**

Dawyot also asserts that the ALJ's finding that he is capable of occasionally stooping is not supported by substantial evidence in the record. Pl. Br. Summ. J. p. 31. Dawyot argues that he is unable to stoop even occasionally due to his weakness on the right side, impaired flexibility and pain. Pl. Br. Summ. J. p. 32. Substantial evidence in the record supports the ALJ's conclusion that Dawyot is capable of occasional stooping.

When determining Dawyot's RFC, the ALJ reviewed the medical records in detail, along with Dawyot's testimony about daily activities, and the medical opinion evidence. Specifically, with regard to Dawyot's ability to stoop, the ALJ noted that Dawyot complained of an unsteady gait, weakness and numbness in his right leg and balance problems. R. 24. The ALJ also noted that Dawyot's records reflect that he ambulated without an assistive device, failed to obtain a new ankle-foot orthosis, that he reported walking "a lot" and caving, and discussed returning to work multiple times. R. 24–25.

The medical opinion evidence supports the ALJ's conclusion that Dawyot is capable of occasional stooping. As noted above, Dr. Chapmon examined Dawyot on September 28, 2011, and found that Dawyot is "doing well with home exercise program," and further stated that he could return to construction work, but "may have some work restrictions." R. 1284. In the denial decision, the ALJ gave Dr. Chapmon's opinion "some" weight, but "reduced [Dawyot] to sedentary work, with limited periods of standing." R. 26. The ALJ noted that Dawyot's musculoskeletal exams are essentially normal, and that his physical therapy notes show marked improvement in his physical abilities. R. 25–26.

On June 3, 2013, state agency physician Thomas Phillips, M.D., assessed the record and determined that Dawyot can perform light work, lifting and carrying 20 pounds occasionally and

9

10 pounds frequently, standing and walking for a total for 4 hours, and sitting for 6 hours in an 8 hour workday. R. 99.  Dr. Phillips found that Dawyot has limited ability to push and pull with his right lower extremity, and should be limited to occasional stooping, kneeling, crouching and crawling, and never climbing ladders, ropes or scaffolds. R. 99–100.

The ALJ gave Dr. Phillips's opinion some weight, and reduced Dawyot's RFC to sedentary work with occasional stooping and crouching, seldom kneeling and climbing and no walking on uneven terrain. R. 25. Thus, the ALJ's finding that Dawyot is capable of occasional stooping is supported by Dr. Phillips's opinion, and the ALJ's RFC provides greater restrictions overall than those suggested by the state agency physicians and Dawyot's treating physician. The ALJ gave Dawyot a carefully considered RFC, placing significant limitations on Dawyot's manipulative functions, including occasional stooping and crouching, seldom kneeling and climbing, no walking on uneven terrain, no operating foot controls with his right lower extremity, no performing overhead reaching with his right upper extremity, and standing up for only fifteen minute intervals. R. 23.  The limitations set forth in the RFC, including occasional stooping, are supported by substantial evidence in the record.

## Credibility

Dawyot also asserts that the ALJ erred by finding his testimony about his subjective symptoms less than fully credible.  Dawyot argues that the ALJ erred by taking his statement in May 2013 that he used a motorized cart out of context, and by improperly relying upon evidence that Dawyot was "walking a lot," was never referred to pain management, and discontinued anti-coagulant therapy. Pl. Br. Summ. J. p. 34–35.[6]

---

[6] In March 2016, the Social Security Administration superseded its policy on assessing the credibility of a claimant's statements, and ruled that "credibility" is not appropriate terminology to be used in determining benefits. See SSR 16–3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016) (effective March 28, 2016). "[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." SSR 16–3p at

10

Dawyot's subjective allegations of pain and limitations are not conclusive. Rather, under the two-step credibility analysis, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Dawyot met his burden of proving that he suffers from an underlying impairment which is reasonably expected to produce his claimed symptoms. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). The ALJ must then evaluate the intensity and persistence of the claimed symptoms and their effect upon Dawyot's ability to work. Id. at 594–95.

Here, the ALJ followed the required two step process, and determined first that there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce Dawyot's symptoms, such as pain. R. 24. See SSR 96–7p, at *2. The ALJ set forth Dawyot's subjective complaints about the intensity, persistence and limiting effects of his symptoms in detail in his opinion. R. 24. In step two, the ALJ concluded that Dawyot's statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely credible. R. 24. Specifically, the ALJ noted that Dawyot's conflicting statements impair his credibility. Id. The ALJ noted that Dawyot complained of "excruciating" levels of pain, yet his physicians are reducing his doses of Neurontin, and only a few medical notes mention severe

---

*1. "In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character." Id. Thus, under SSR 16–3p, the ALJ is no longer tasked with making an overarching credibility determination and instead must assess whether the claimant's subjective symptom statements are consistent with the record as a whole.
   Here, SSR 16–3p was issued long after the ALJ's consideration of Dawyot's claim, and both the ALJ's opinion and the parties' briefs speak in terms of a "credibility" evaluation. Accordingly, I will analyze the ALJ's decision based on the provisions of SSR 96–7p, which required assessment of the claimant's credibility." See Keefer v. Colvin, No. CV 1:15-4738-SVH, 2016 WL 5539516, at *11 (D.S.C. Sept. 30, 2016); ford v. Colvin, No. 2:15-CV-05088, 2016 WL 5171986, at *5 (S.D.W. Va. Sept. 21, 2016); Hose v. Colvin, No. 1:15CV00662, 2016 WL 1627632, at *5 (M.D.N.C. Apr. 22, 2016).
   However, I note that the methodology required by both SSR 16–3p and SSR 96–7p are quite similar. Under either, the ALJ is required to consider Dawyot's report of his own symptoms against the backdrop of the entire case record; in SSR 96–7p, this resulted in a "credibility" analysis, in SSR 16–3p, this allows the adjudicator to evaluate "consistency."

ongoing pain. Id.  The ALJ also noted that Dawyot reported using a motorized cart on his application for benefits, but the records reflect that that Dawyot can walk without an assistive device, stopped wearing his right ankle-foot orthosis, and reported exercising regularly to increase strength, mobility and sensation in his right lower extremity. R. 24.  The ALJ also noted that Dawyot discussed employment opportunities with his physicians, and reported caving in July 2011, and "walking a lot." R. 24–25.

   The ALJ also noted that Dawyot's physicians suspected that his stroke and ischemic attacks were related to cocaine use, and that Dawyot abused substances and screened positive for cocaine and marijuana during the alleged period of disability.  R. 25.  Indeed, in December 2010, Dawyot reported that he used cocaine and admitted to "regular partying." R. 555.

    It is apparent from the decision that the ALJ reviewed the medical record regarding Dawyot's impairments and measured his statements about the severity of his symptoms and limitations against the objective medical evidence.  It is for the ALJ to determine the facts and resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Dawyot's objection to the ALJ's credibility analysis essentially disagrees with the ALJ's interpretation of the records and his conclusions.  Contrary to Dawyot's assertion, the ALJ's credibility analysis is supported by substantial evidence, and the court will not disturb it.

## RECOMMENDED DISPOSITION

For the reasons set forth above, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** Dawyot's Motion for Summary Judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Enter: June 13, 2017

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge